IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

S.W., a minor, individually and as wrongful
death beneficiary of Samuel Wilson, Deceased,
by and through her court-appointed guardian,
Alena Harris; and ANGELA ERVIN,
individually and as a wrongful death beneficiary
of Samuel Wilson, Deceased                                                                PLAINTIFFS

v.                                                                  CIVIL ACTION NO. 3:10cv502-DPJ-FKB

UNITED STATES                                                                             DEFENDANT

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This wrongful-death, medical-malpractice case arising under the Federal Tort Claims Act ("FTCA") is before the Court following a bench trial conducted from December 10, 2012, to December 12, 2012. At the close of the evidence, the Court asked the parties to submit post-trial briefs. Having fully considered those submissions, the evidence at trial, and oral argument, the Court finds that judgment should be entered in favor of Defendant.

I.   Analysis

Pursuant to Federal Rule of Civil Procedure 52(a), the Court must provide findings of fact and conclusions of law. After making some general factual findings, this order will address applicable law and then analyze the issues in light of the facts.

   A.   General Findings of Fact

Samuel Wilson, a 38-year-old veteran, was admitted to Hines VA Medical Center in Chicago, Illinois, on May 14, 1995, for surgery to remove a tumor on his jaw bone. Mr. Wilson survived the surgery, but later began coughing up blood and eventually suffered an anoxic brain injury that left him in a persistent vegetative state. Given the new reality of his condition, Wilson

was transferred to the G. V. Sonny Montgomery VAMC in Jackson, Mississippi, to be closer to family.

On November 22, 1996, Mr. Wilson and his wife Bernadette filed a medical-malpractice lawsuit against the United States. That case settled in September 1997, but the settlement agreement preserved "any potential wrongful death claims" of Mr. Wilson's minor children Angela Ervin and S.W. In the years that followed, Mr. Wilson was often diagnosed with and treated for multiple decubitus ulcers and various infections. Those conditions reappeared in August 2009, leading to treatment with a battery of antibiotics. And while receiving that treatment, Wilson's doctors diagnosed advanced metastatic liver disease. Mr. Wilson died the following month on September 12, 2009. The cancer was at least a contributing cause of the death, and the parties dispute whether Mr. Wilson's vegetative state also contributed to the death.

Mr. Wilson's daughters now bring this suit for wrongful-death damages. They contend that the care received at the VA in Illinois in 1995 proximately caused Mr. Wilson's death in 2009.[1] While the Court is sympathetic to the family for its loss, Plaintiffs failed to meet their burden of proving a breach of duty. Judgment for Defendant is therefore necessary.

B.   Applicable Law

Plaintiffs' medical-malpractice claims arise under the FTCA, which "holds the Government liable for 'injury or loss of property, or personal injury or death caused by the

---

[1] Plaintiffs' portion of the Pre-Trial Order also asserts that the Government failed to comply with its settlement obligations to Mr. Wilson. According to counsel, the VA breached the settlement agreement and wrongfully suspended payments to Mr. Wilson which were intended for his care. Plaintiffs attempted to amend the complaint to bring this claim, but the motion was denied by Magistrate Judge F. Keith Ball because Plaintiffs were not parties to the contract and the contract claim was time barred. The Magistrate Judge's order was not appealed, and Plaintiffs were advised prior to trial that the claim would not be heard.

negligent or wrongful act' of federal employees acting within the scope of their employment." *Ellis v. United States*, 673 F.3d 367, 372 (5th Cir. 2012) (citing 28 U.S.C. § 1346(b)(1)).

The FTCA "imposes liability on the Government 'in accordance with the law of the place where the act or omission occurred,' making the Government liable 'in the same manner and to the same extent as a private individual under like circumstances.'" *Id.* (citing 28 U.S.C. §§ 1346(b)(1), 2674). This statute creates a choice-of-law issue in this case, requiring the Court to decide between the law of Illinois (where the surgery and injury occurred) and Mississippi (where Mr. Wilson died).

The FTCA requires application of the whole law of the state where the acts occurred, which in this case is Illinois, and that includes its choice-of-law rules. *Richards v. United States*, 369 U.S. 1, 11 (1962); *Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1450 (5th Cir. 1990) (citing *Richards*). Thus, the Court looks to the choice-of-law rules applied by state courts in Illinois to determine which state's substantive law governs Plaintiffs' claims. The parties agree, and so does the Court, that the choice-of-law question must be considered on an issue-by-issue basis to determine whether conflicts exist.

Here, conflict does exist. On liability, Illinois requires experts to hold licenses in the same field of medicine as the medical professional(s) about whom they testify, but it also offers a slightly more plaintiff friendly version of *res ipsa loquitur*. Procedurally, Illinois's wrongful-death statute would bar this case entirely whereas the parties seem to agree that it could proceed under the Mississippi Wrongful Death Statute. *Compare* Miss. Code Ann. § 11-7-13, *with* 740 Ill. Comp. Stat. 180/1.

Starting with liability, the parties agree that Illinois law applies because the surgery and alleged injury occurred there. So the next question is whether the wrongful-death laws of Illinois or Mississippi apply. Here the parties have dispute because applying Illinois law would require dismissal. 740 Ill. Comp. Stat. 180/1. Plaintiffs offer several arguments for applying Mississippi law. The most persuasive is that the Government's response to Plaintiffs' Request for Admission No. 11 "admitt[ed] that the Mississippi Wrongful Death Statute, Miss. Code Ann. § 11-7-13 is applicable."

The Government acknowledges its admission that the Mississippi wrongful-death statute applies, but suggests without supporting authority that the Court should reject its admission and independently determine the choice-of-law issue. The Court declines that invitation because the request for admission validly sought admission on a mixed question of law and fact and because it comes too late. Granting the Government's post-trial request to ignore its own admission made in December 2011 would require dismissal. Yet Plaintiffs incurred considerable time and expense litigating this case with the understanding that the Mississippi wrongful-death statute would apply. The Government is stuck with its admission.[2]

C.  The Illinois Statue of Repose Is an Affirmative Defense

The Government argues that an Illinois statute of repose would preclude this claim. *See* 735 Ill. Comp. Stat. 5/13-212(b). Plaintiffs acknowledge that it would have, had the Government pleaded repose. As they note, the Government made no reference to the statute of repose in its

---

[2]As discussed later, the Court has concluded that Plaintiffs failed to meet their burden of proof. Nevertheless, the Court elected to address this and other choice-of-law issues because they are potentially dispositive, and if the Court erred on these matters, then the case would fail on additional grounds.

4

Answer, failed to move to amend before the July 2011 amendment deadline, never moved to enforce the statute before trial, made no mention of it in the pre-trial order or before the close of evidence, and raised it for the first time on January 28, 2013, in its post-trial memorandum of law.

The Government attempted to fix this mistake with a post-trial motion to amend, but the deadline has passed, and allowing a case-dispositive amendment after the close of evidence would create obvious prejudice. The Government therefore argues in the alternative that statutes of repose are jurisdictional and cannot be waived. But its primary authority for the position is dicta that nevertheless acknowledges a contrary opinion held by both Illinois and the Seventh Circuit. *See West v. United States*, No. 08-646-GPM, 2010 WL 4781146 (S.D. Ill. Oct. 25, 2010).

Indeed, Illinois courts hold that repose is an "affirmative defense[] subject to forfeiture." *McRaith v. BDO Seidman, LLP*, 909 N.E.2d 310, 327 (Ill. App. Ct. 2009); *see also Smith v. Krolik*, No. 1-10-1132, 2011 WL 10068662, at *16 (Ill. App. Ct. 2011); *S. Side Trust & Sav. Bank of Peoria v. Mitsubishi Heavy Indus., Ltd.*, 927 N.E.2d 179, 193 (Ill. App. Ct. 2010); *Willett v. Cessna Aircraft Co.*, 851 N.E.2d 626, 636 (Ill. App. Ct. 2006); *Jones v. Dettro*, 720 N.E.2d 343, 346 (Ill. App. Ct. 1999); *Ocasek v. City of Chi.*, 656 N.E.2d 44, 50–51 (Ill. App. Ct. 1995); *Pederson v. West*, 562 N.E.2d 578, 583 (Ill. App. Ct. 1990); *Delnick v. Outboard Marine Corp.*, 555 N.E.2d 84, 89 (Ill. App. Ct. 1990). The Seventh Circuit has reached the same conclusion. *McMahon v. Eli Lilly & Co.*, 774 F.2d 830, 836 (7th Cir. 1985) (holding that "Lilly did not seasonably raise Section 13-213 as an affirmative defense"). Thus, statutes of repose must be pleaded. *See* Fed. R. Civ. P. 8(c). The Government waived this argument.

5

D.  Plaintiffs Have Not Proven Liability

Turning to the merits of the case, the Court must first consider whether under Illinois law Defendants breached any legal duties to the Plaintiffs in 1995 that caused Mr. Wilson's brain injury. Plaintiffs offered three theories: (1) breach of the duty of care; (2) *res ipsa loquitur*; and (3) lack of informed consent. The evidence fails to support them.

1.  Plaintiffs Failed to Prove Breach in 1995

The elements for a medical-malpractice claim were summarized by the Supreme Court of Illinois in *Purtill v. Hess*:

> In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care.

489 N.E.2d 867, 872 (Ill. 1986) (citations omitted). These elements must be established through competent expert testimony. *Dolan v. Galluzzo*, 396 N.E.2d 13, 15 (Ill. 1979). In this case, Plaintiffs relied entirely on the testimony of Dr. Thomas Joiner. They called no fact witnesses and no other experts regarding liability for the events in 1995.

From the outset, the Government challenged Dr. Joiner's testimony. It first filed a motion [65] under Rule 702 of the Federal Rules of Evidence. The Court would have been within its discretion to grant the motion and with it summary judgment. But because the issues remained unclear after reading the parties' submissions, the Court decided to err on the side of caution and carry the issue to trial so it could test Dr. Joiner's proposed testimony. That opportunity never occurred, however, because Dr. Joiner was presented through his deposition transcript.

6

As for the transcript, the Government renewed its objections to Dr. Joiner's testimony on numerous grounds, including his lack of qualifications and competence and his failure to establish a prima facie case of medical malpractice. Starting with his qualifications, Dr. Joiner was Mr. Wilson's treating physician after Mr. Wilson was moved to Jackson, Mississippi, in a vegetative state. Dr. Joiner is the uncle of Plaintiffs' lead counsel, and while that relationship does not preclude his testimony, it diminishes his credibility. As for his training, Dr. Joiner holds a medical degree in family medicine, yet he offered opinions regarding the standard of care for post-operative treatment provided by dentists/oral surgeons and nurses. The Government generally objected that Dr. Joiner lacked the specialized experience to render these opinions, but the Court initially overruled the objection citing cases like *Peteet v. Dow Chemical Co.*, 868 F.2d 1428, 1431–32 (5th Cir. 1989) (holding that a medical doctor need not be a specialist to testify in a given area). However, that ruling occurred before the Court asked the parties why Illinois law should not apply to the liability issues in this case. Now that the parties agree Illinois law does apply, the Court must consider the Government's argument in light of the correct law.

In Illinois, not just any expert will do. In *Dolan v. Galluzzo*, the Illinois Supreme Court held that "in order to testify as an expert on the standard of care in a given school of medicine, the witness must be licensed therein." 396 N.E.2d at 16. Thus, "a practitioner of one school of medicine is not competent to testify as an expert in a malpractice action against a practitioner of another school of medicine." *Id.* at 15.[3] The Supreme Court of Illinois was urged to temper the

---

[3]Rule 601 of the Federal Rules of Evidence states, "Every person is competent to be a witness unless these rules provide otherwise. But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." Thus, the Court looks to Illinois law and not the Federal Rules of Evidence.

approach in *Sullivan v. Edward Hospital* but instead entrenched its position. 806 N.E.2d 645, 653 (Ill. 2004). There, the plaintiff offered a medical doctor to discuss the standard of care for nurses, a subject for which the doctor professed requisite knowledge and experience. *Id.* at 655–56. The court affirmed the trial court's decision to strike the opinion and refused to weaken the "foundational requirement" that an expert physician hold a license in the school of medicine about which he proposes to testify. *Id.* at 654. The court noted that "[t]he [foundational] requirements are a threshold beneath which the plaintiff cannot fall without failing to sustain the allegations of his complaint." *Id*. at 655 (citation omitted). The court also refused to consider, and therefore limited, an exception that had been recognized by one of Illinois's intermediate appellate courts. *Id*. at 656 (discussing *Wingo v. Rockford Mem. Hosp.*, 686 N.E.2d 722 (Ill. App. Ct. 1997)); *see also Petryshyn v. Slotky*, 902 N.E.2d 709 (Ill. App. Ct. 2008) (discussing way in which *Wingo* remains viable, albeit in limited fashion, following *Sullivan*).

This rule impacts Dr. Joiner's testimony. As stated, Dr. Joiner offered opinions regarding post-surgery standards of care for surgeons and nurses. Yet he lacks a license in oral surgery or nursing. Starting with his opinions regarding the nurses, *Sullivan* makes clear that those opinions are not competent evidence. 806 N.E.2d at 655–56; *see also Davis v. Holy Cross Hosp.*, No. 1-10-1317, 2011 WL 10068640, at *6 (Ill. App. Ct. Dec. 2, 2011) (doctor not competent to testify as to standard of care for nurses). Moreover, this Court precluded these opinions at trial because Dr. Joiner testified that he had no basis for knowing the standard of care for nurses. The opinions regarding the nurses were struck.

Looking to the surgeons, Dr. Joiner offered a number of opinions that clearly related to oral surgery. *See, e.g.*, Joiner Dep. 66 (opining that providers should have known whether wire

8

cutters were necessary). Those opinions clearly fall beyond the scope of his license. *Dolan*, 396 N.E.2d at 16. But the focus of Dr. Joiner's testimony was the need to order post-surgery monitoring. *See* Joiner Dep. 65–67 (opining on need to monitor surgical site and failure to assess and monitor oral cavity for pooling blood and saliva). He testified specifically as to the added risk of surgery performed in or near the airway and the related need for a surgeon to order post-surgery monitoring. *Id*. at 60. Much like the experts in *Dolan* and *Sullivan*, Dr. Joiner described these as universal standards that any doctor would know. *Id*. at 108. The Court concludes, however, that the testimony relates to post-surgery standards of care for oral surgeons. "[T]he witness must be licensed therein," *Dolan*, 396 N.E.2d at 16, and there is no suggestion that Dr. Joiner was. His testimony was not competent to establish a prima facie case, there were no other experts, and "absent an expert witness qualified to give standard of care testimony, the malpractice suit is subject to dismissal." *Smeilis v. Lipkis*, 967 N.E.2d 892, 871 (Ill. App. Ct. 2012) (citation omitted).

Even assuming Dr. Joiner could testify competently regarding the standard of care for oral surgeons, his testimony still suffers from a number of deficiencies. To begin with, there is serious question whether Dr. Joiner's reports provided sufficient notice because by his own admission they failed to explain the standard of care. Plaintiffs' counsel attempted to remedy that deficiency in Dr. Joiner's trial testimony by having him read, verbatim, the opinions of Plaintiffs' experts from the 1997 litigation and then adopt those opinions as his own. Merely parroting the opinions of others stretches the boundaries of Rule 703 of the Federal Rules of Evidence which allows expert reliance on "facts and data." In any event, assuming the testimony can be admitted, it is unpersuasive and insufficient.

9

Beginning with the opinions that did not relate to post-surgery monitoring, as to all but one, Dr. Joiner merely read the other experts' opinions into the record, offering little or no explanation. *See, e.g.*, Joiner Dep. 65–67. The opinions, as read, were conclusory and unsupported. And even if admitted, they were unpersuasive. The one exception was Dr. Joiner's opinion that Mr. Wilson was improperly intubated. This opinion was also adopted from the earlier litigation, but Dr. Joiner was at least asked to explain it. According to him, the medical records show that Mr. Wilson was improperly intubated because his stomach was distended. But Dr. Joiner also testified that Mr. Wilson was being "bagged" when he coded and that bagging would cause the stomach to distend. Joiner Dep. 157. Thus, it remains unclear whether a breach occurred. But even if it did, it remains unclear whether the alleged problem intubating Mr. Wilson occurred before or after the brain injury. The medical records Dr. Joiner cites state that the event occurred "post-respiratory arrest." Joiner Dep. 104. The Court is not persuaded that Plaintiffs have shown breach or proximate cause.

Looking then to the monitoring issues, about which Plaintiffs focused their examination, the Court concludes that Dr. Joiner's opinions failed to establish breach or proximate cause and were at best conclusory and speculative. For example, Dr. Joiner read then adopted the following opinion from another expert:

> Based on all the information contained or listed within this document and my expert--experiences listed in or unlisted within this document, it is my opinion that the proximate cause of this anoxic brain damage was a direct result from the defendant's breaches of duty owed under the reasonable accepted standard of care in 1995 for a dental procedure for a patient under the complete control, care and custody of the defendant.

10

Joiner Dep. 69. It is not enough to simply say that someone caused injury by breaching the standard of care. "Expert testimony is required in a medical malpractice action to establish the standard of care for a particular practitioner and the deviation from the standard of care." *Davis*, 2011 WL 10068640, at *5.

Dr. Joiner attempted to provide these details when he testified that "[a]mong the other breaches of standard of care, Mr. Wilson was under anesthesia and post anesthesia recovery. The surgeon did not order the proper patient monitoring and/or the staff failed to properly monitor Mr. Wilson." Joiner Dep. 69. But what is the "proper patient monitoring" and how did the surgeons deviate from it? Plus, none of this testimony is overly persuasive because it lacks a solid foundation in the evidence. For example, Dr. Joiner states that the doctor should have ordered the nurses to monitor the site, but there were no fact witnesses suggesting that the order was not given. Absent witnesses, Dr. Joiner relies on the medical records to say monitoring was not ordered, yet he acknowledges that "[i]t was noted by the nurse in the progress note that it occurred." *Id.* at 109.[4] The speculative nature of this testimony is further highlighted by Dr. Joiner's inability to say whether breaches by the surgeons or the nurses caused the brain injury, stating instead that it was caused by the surgeons "and/or" the nurses. *Id*. at 69. Yet he admitted his lack of qualifications to opine regarding the standard of care for nurses.

So even if Illinois's same-school-of-medicine rule did not apply, the Court would still find that Plaintiffs failed to offer persuasive evidence regarding the standard of care, breach, and

---

[4] He later opined that the doctors breached the standard of care by failing to give written instructions to the nurses regarding monitoring, *id*. at 114, an opinion that was not in his report and therefore inadmissible. Plus, absent a license to practice surgery, Dr. Joiner cannot testify about the standard of care for post-operative orders. In any event, Dr. Joiner did not say what those precise written orders should have said that was different than the monitoring that occurred.

proximate cause. In making this ruling, the Court recognizes Plaintiffs' argument that the Government offered no evidence disproving malpractice in 1995. But the burden of proof rests solely with the Plaintiffs who relied entirely on Dr. Joiner. The Government correctly challenged that testimony and had no burden to call its own witnesses.

2. *Res Ipsa Loquitur*[5]

Plaintiffs contend that *res ipsa loquitur* applies and is sufficient to establish the Government's negligence. Section 5/2-1113 of Chapter 735 of the Illinois code states:

> Medical malpractice--res ipsa loquitur. In all cases of alleged medical . . . malpractice, where the plaintiff relies upon the doctrine of res ipsa loquitur, the court shall determine whether that doctrine applies. In making that determination, the court shall rely upon either the common knowledge of laymen, if it determines that to be adequate, or upon expert medical testimony, that the medical result complained of would not have ordinarily occurred in the absence of negligence on the part of the defendant. Proof of an unusual, unexpected or untoward medical result which ordinarily does not occur in the absence of negligence will suffice in the application of the doctrine.

As explained in *Gatlin v. Ruder*, "[t]he *res ipsa loquitur* doctrine is a species of circumstantial evidence permitting the trier of fact to draw an inference of negligence if the plaintiff demonstrates that she was injured (1) in an occurrence that ordinarily does not happen in the absence of negligence, and (2) by an agency or instrumentality within the defendant's exclusive control." 560 N.E.2d 586, 590 (Ill. 1990) (citations and quotations omitted).

In *Gatlin,* the Illinois Supreme Court comprehensively described the general principles governing the application of *res ipsa loquitur* to medical malpractice cases:

---

[5]Under Illinois law, the *res ipsa loquitur* claim appears defective for failure to provide certifications as required by 735 Ill. Comp. Stat. 5/2-622(c). But such failure must be pursued by a motion under 735 Ill. Comp. Stat. 5/2-619. *See* 735 Ill. Comp. Stat. 5/2-622(g). The Government made no such motion.

> When a thing which caused the injury is shown to be under the control or management of the party charged with negligence and the occurrence is such as in the ordinary course of things would not have happened if the person so charged had used proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from want of proper care. This in essence is the doctrine of *res ipsa loquitur,* and its purpose is to allow proof of negligence by circumstantial evidence when the direct evidence concerning cause of injury is primarily within the knowledge and control of the defendant. Like any other proof it may be explained or rebutted by the opposing party. . . . [T]he inference, or presumption, [of negligence] does not simply vanish or disappear when contrary evidence appears, but remains to be considered with all the other evidence in the case and must be weighed by the jury against the direct evidence offered by the party charged.

560 N.E.2d at 590 (citations and quotations omitted). And in *Adams v. Family Planning Associates Medical Group, Inc.*, the court explained:

> In order to show the first element of *res ipsa loquitur,* an occurrence that ordinarily does not happen in the absence of negligence, a plaintiff is not required to show that the injury in question never happens without negligence, only that it does not ordinarily happen without negligence. *Spidle*, 79 Ill.2d at 9, 37 Ill. Dec. 326, 402 N.E.2d 216. A plaintiff need only present evidence reasonably showing facts exist that allow an inference that the occurrence is one that ordinarily does not occur in the absence of negligence. *Perry v. Murtagh*, 278 Ill. App. 3d 230, 236, 214 Ill. Dec. 1021, 662 N.E.2d 587 (1996). Such an inference cannot be based solely upon the fact of a rare and unusual result, but such evidence must be coupled with proof of a negligent act. *Perry*, 278 Ill. App. 3d at 236, 214 Ill. Dec. 1021, 662 N.E.2d 587.

733 N.E.2d 766, 775–76 (Ill. Appt. Ct. 2000).

Plaintiffs again turn to Dr. Joiner to make their *res ipsa loquitur* argument. According to him,

> Mr. Wilson was under the government's complete control and care and custody. The injury speaks for itself because anoxic brain injury, and required life support machines, and care, and death are not foreseeable outcomes to the type of routine procedures Mr. Wilson was scheduled to have.

13

Joiner Dep. 69. But Dr. Joiner offered no opinion that the result would "not occur in the absence of negligence." 735 Ill. Comp. Stat. 5/2-1113. To make that showing, the plaintiff must present evidence that the unexpected result "does not ordinarily happen without negligence." *Adams*, 733 N.E.2d at 775–76 (citations omitted). And "[s]uch an inference cannot be based solely upon the fact of a rare and unusual result, but such evidence must be coupled with proof of a negligent act." *Id*. at 776. Here, Dr. Joiner attempts to rely on the unexpected, or as he says it, the "unforeseeable" result without competent evidence that it would not occur absent negligence or proof of a negligent act. *Id*. And in any event, Dr. Joiner lacked competence under Illinois law to render the missing opinions. *See Dolan*, 396 N.E.2d at 16. The Court therefore finds as a matter of law that *res ipsa loquitur* does not apply.[6]

### 3. The Informed-Consent Claim Fails

Plaintiffs claim that Mr. Wilson never gave informed consent to the surgery in 1995. As with the other claims, Plaintiffs relied exclusively on Dr. Joiner, who concluded that Mr. Wilson was never told about alternatives to surgery like radiation, chemotherapy, or further monitoring for growth. Joiner Dep. 20. He therefore concluded that informed consent was never given. Even assuming Dr. Joiner was competent to offer an expert opinion on the advice an oral surgeon should give prior to surgery—which he is not—Dr. Joiner lacked an evidentiary basis to support his opinion.

---

[6]Whether this anoxic brain injury would have occurred absent negligence falls beyond the "common knowledge of laymen." 735 Ill. Comp. Stat. 5/2-1113. Even after trial, the actual physiological cause of the brain injury remains unclear. Competent expert testimony was required.

Dr. Joiner was not present when the surgery occurred and Plaintiffs called no fact witnesses to explain what Mr. Wilson heard. There was, however, a form Mr. Wilson signed that stated: "This written consent documents the discussion I have had with my physician about my need for the operation or procedure named above; the expected results; potential risks and complications; and available alternative treatments." Def.'s Trial Ex. D1, at HARRIS-00551. Plaintiffs note that this form also includes a line for "Exception to surgery," which is left blank, and argue that it proves that Mr. Wilson was never told about "alternatives" to surgery. But to the extent the form is vague, Plaintiffs offered no fact witnesses to explain how the hospital used it. Obviously some conversation occurred with Mr. Wilson as he acknowledged in the consent form, and Dr. Joiner's testimony that alternatives were never discussed is simply speculative and unpersuasive.

The informed consent claim fails for another reason. To show a causal connection, Plaintiffs must show that proper information "would have caused a reasonable person in the position of the patient to refuse the surgery or therapy . . . ." *Coryell v. Smith*, 653 N.E.2d 1317, 1319 (Ill. App. Ct. 1995). Dr. Joiner never addressed this issue. And while the surgery was considered major, Dr. Joiner referred to it as commonly done and routine. Joiner Dep. 19, 69. Without knowing what the doctors did or did not tell Mr. Wilson about alternatives, it is impossible to say whether a reasonable person would have refused and opted for alternatives Dr. Joiner described such as radiation or chemotherapy. Thus, the evidence is insufficient to find a lack of informed consent.

II.     Conclusion

This is a tragic case, but it should have been dismissed before discovery under Illinois law.  Instead, the Government waived several dispositive arguments and the case proceeded to trial.  Once there, Plaintiffs failed to offer competent evidence and otherwise failed to persuade the Court that a breach occurred in 1995.  So while the Court has certain misgivings, it is constrained by the record and finds that Plaintiffs failed to meet their burden of proof.  Those issues not addressed in this Order would not have changed the outcome.  A separate judgment will be entered in accord with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED** this the 2nd day of April, 2013.

>                    s/ *Daniel P. Jordan III*
>                    UNITED STATES DISTRICT JUDGE